asking this court to affirm a board decision that's based on a doctrine that the board has since abandoned and to rely on what the government itself on the last page of its brief calls an implicit finding, a finding the board did not make and could not have made on this record. Are we talking about the secondary considerations? That's the one, Your Honor, where the government is trying to urge on the court an implicit finding that the secondary considerations were found not to have existed, that the long-felt need had been satisfied in 1930, which is not a finding the board ever made nor could it have made because it is conceded by Adidas, a vice expert, before the board and on page 41 of its own brief to this court that there was a long-felt need that persisted through to the filing of Nike's patent application. At the very least, that's something the board should have considered and did not, and that's a ground in itself for a remand. I'd also start with another stark example of error, which is claim 49. That is the claim that requires apertures formed by omitting stitches and position for receiving laces. The government itself doesn't even address that limitation, and no wonder, because neither of the cited prior art references discloses it in any way. Schuessler undisputedly doesn't. It's a hat. There are no laces. And as for Nishida, Adidas' own expert conceded a deposition that he couldn't identify any apertures for receiving laces in that reference. The standard you had to meet was some regulation where you had the burden to establish that claims 48 and 49 were patently distinct from each other, right? That's correct, Your Honor. You're talking about Nishida, and there's Schuessler references, but the comparison is between the two claims. So there are two separate requirements. The comparison between the two claims is a requirement, but the board did not deny the motion to amend on that basis. It's very clear about that. The basis on which it did deny the motion was because it found that we had the burden to prove patentability over Nishida and Schuessler. That's an error in itself, and we'll get to that. But even on its own merits, there is no way to find that claim 49 is unpatentable over Nishida and Schuessler. And they denied it because they felt like you did not meet the standard for a reasonable substitute number of claims where you were trying to replace one patent claim with two patent claims. They did discuss that, Judge Chen, but there's a statement in the decision that they do not deny the motion to amend on that basis, which is why the PTO does not defend that argument. They don't claim that there's a difference. Right, but then they grouped them together, I guess, with the independent claim, right? They grouped them together, and that is the problem. They concluded that the independent claim was not patentable. But they disregarded the claim that distinguished claim 49, which is these apertures that are Right, but I'm just trying to, this is more administrative, trying to understand what they did. The ground here. My understanding was they didn't, quote unquote, put the cart before the horse by concluding that the claims were unpatentable, and because they were unpatentable, they would be grouped together, right? I thought it was more because they felt like that your side did not meet the standard, for establishing that these two claims are a reasonable substitute number of claims for the canceled claim 19, or whatever it was. No, Your Honor, that is not the basis for the Board's decision. The basis for the Board's decision is on page 825, which is also page 25 of the Board decision, where they have a paragraph in the center of the page that talks about claims 48 and 49, and then they are talking about the patentability over Nishida, and they say, with respect to the additional limitations of claim 49, Nishida describes forming lacing areas by knitting. Now, of course, lacing areas says nothing about the apertures. In fact, there's an area where laces will eventually go, doesn't mean that the holes where the laces go are formed by omitting stitches, and in fact, as our expert, Mr. Tonkel testified, without contradiction on this point, the disclosure of Nishida tells a skilled artisan that the holes are going to be punctured, not created by omitting stitches. The Board then goes on and cites Nike's patent against it, and says, further the specification of the 011 patent. You know, you don't dispute that omitting stitches in a knitted material to create apertures consciously is something old, do you? Well, we don't deny that it might be. Nike is not the first one that came up with that idea, that to consciously design holes in a knitted material based on omitting stitches while you're knitting it. That's not an argument we've made, but we don't need to make that argument, Your Honor, because that's not the basis on which the Board resolved this claim. It didn't address this at all. It believed that Nike's own patent could be cited against it for this teaching. This is a combination patent. That's certainly true, but then there needs to be more than simply, even if the Board had identified this limitation in the prior art, which it didn't, there would have to be some motivation to combine the reference that disclosed whatever it is, this omitting stitches limitation. And there isn't any of that either. At the very least, there would need to be a remand for the Board to articulate some reasoning on which it could find that this limitation had been disclosed. Instead, all it has is a faulty citation to Nishida, which clearly does not disclose this limitation, and then citing our own specification against it. In Claim 19, and not resisting the institution grounds for Claim 19, do you agree with the other side that, in effect, you've conceded that the aperture's limitation is part of the prior art? No, Your Honor. Claim 19 does not disclose an aperture formed by omitting stitches, position for receiving Okay, the part about omitting the stitches in a position where you would use the aperture for lacing. Okay, I'm not talking about that language. I'm just talking about apertures. Well, Claim 19 certainly does disclose an aperture in the WEF-knitted textile element. But that is not the limitation of Claim 49 that we're talking about that the Board failed to address. This is a narrowing version. Right, I'm just, you know, as a starting point, apertures is something in this textile element that's part of the prior art that's been conceded. Now, the real grounds of the dispute for you is the creation of the aperture by omitting stitches in a location so that you could use it for lacing. That's right, Judge Chen. And the problem is that the only evidence that was cited by either the Board or by Adidas is the disclosure in Nishida of a net-like structure in the toe area for increasing air exchange. Now, there are no laces in the toe area. There's certainly no suggestion that those apertures were formed by omitting stitches. The way the Board tried to make the leap of logic from what Nishida discloses to what we claim in the proposed amended claim is it points to the fact that Nike uses the omission of stitches to improve air permeability as a general matter. It then says that anyone who wanted to improve air permeability must necessarily have done it the way Nike said to do it in its patent specification. And then leaps from that to say that they would also use the omission of stitches for a completely different purpose, namely the creation of apertures for laces. There is no evidence supporting either of those leaps of logic. It certainly isn't in Adidas' experts' report. So at the very least, there needs to be some articulation of a basis for that element in the prior art, which the Board did not provide. I guess the other side would say all that they need to worry about is apertures alone, which is conceded to be in the prior art, because the apertures based on omitting stitches is not something that needs to be considered because that's more of a product by process kind of a limitation and how the product is made by a particular process is not relevant to patentability. That, Jeff Shen, is not an argument that was made below as to Claim 49. If it had been made below, I think the Board's answer to that would have been the answer it gave on the other product by process argument that Adidas made with respect to a flat knit structure or flat knit edges, which imparts structural differences when you flat knit an edge or when you omit a stitch to create an aperture as opposed to punching out the material when the yarns get frayed and they need to be further finished, whether by searing through heating or some additional stitching or some kind of cover over them, otherwise they'll unravel. The Board made that finding specifically as to flat knit edges. We think it would have made the very same finding, it's the same analysis, as to punching out lacing holes, but it never had a chance to answer that question because it wasn't made. No finding of that nature was requested of the Board and it certainly wasn't made and under Chenery, it's not a proper basis for affirmance. It's the sort of thing that would have to be assessed by the Board on remand. The Master Image 3D, we have a lot of issues to get through. You only have five minutes left. I guess you would have us vacate and remand that particular denial? Yes, Your Honor. Assuming we have to vacate the other, the merits rejection. Correct, Your Honor. I mean, the PTO has abrogated or at the very least radically reinterpreted the idle-free decision. It no longer asserts, at least as a general matter, the idle-free rule that was imposed against Nike. We didn't get a response to our 28-J letter, so I don't know what the government's position is going to be. Did you give us a 28-J letter on Proxicon? On Proxicon, no we did not, Your Honor, but I'm happy to address it if Your Honor would like. I mean, that is... Is there anything to address at this point in light of Proxicon? There is, Your Honor. Proxicon did not address the plain text of the statute in Section 316E, which says that the burden of proof in an IPR is on the petitioner with respect to a proposition of unpatentability. For whatever reason... On an amended claim? I beg your pardon? On an amended claim? The Proxicon certainly did not address that question. I mean, and the language of 316E does not differentiate between original issued claims and amended claims. It says, in an IPR, the burden of a proof on a proposition of unpatentability is on the petitioner. There is no reason to make the non-statutory distinction that the PTO is trying to make in its brief to this Court. In fact, they don't cite anything at all as far as I can tell. It's simply an assertion that they don't want it to apply to amended claims. If they thought that that was consistent with the statute, they could maybe issue a regulation or something that said that. They haven't done that, but quite frankly, we think such a regulation would be void anyway because it's inconsistent with the statute. We think the thing to have done was to recognize that the burden of proof, as to the issue that Congress has spoken to, the proposition of unpatentability is on the petitioner. There are plenty of other issues where the patent owner can be given the burden, such as showing that you've got a reasonable number of claims, showing that you haven't added new matter, you haven't broadened the scope of the claims. The Board found that we met our burden on that. It didn't deny the motion to amend on that basis. But what it can't do and what the PTO can't do to regulation or otherwise is something contrary to the statute and the statute is clear, Proxicon did not address that language for whatever reason, it wasn't raised in that case, so this panel is perfectly able to and should enforce the language of the statute as it is written. Now I do want to make sure that I get through all of the points and the last one that's remaining is that there's simply no substantial evidence of a motivation to combine here and this applies to all of the claims at issue, the proposed amended claims. What you have here are two references. You have Nishida and you have Schuessler. They approach the issue in completely different ways. Nishida involves a web of fabric, you put the patterns as close together as you can, you cut them out and you do your best to minimize the waste by making sure that the wasted material is lighter and cheaper. Was it known in the prior art that when you're doing flat knitting, you can flat knit a large web and then cut out the desired design or alternatively when you're flat knitting you can knit to shape? Was that known in the art? The two references are Nishida and Schuessler are prior art. The question is what basis is there for considering that a skilled artisan would have taken the cutting of a pattern out of a web in Nishida and say, you know what, I'm going to get rid of the pattern, I'm going to get rid of the cutting, I'm going to get rid of the web and I'm going to do this all based on a reference that dates back to the 1930s. There is no evidence of a motivation to do that and at the very least it would have to have been considered in light of the fact that there was an established, acknowledged, admitted need in this case for a method to reduce cutting waste and yet nobody did it in the 60 years since Schuessler was published or in the 10 years since Nishida was issued until Nike came up with it. The motivation to combine, that's a question of fact, right? It is a question of fact, Your Honor. There's substantial evidence. It certainly is, Your Honor, as would be long felt need if the board had made a finding on it, but it didn't. At the very least, it should have considered whether there was a established long felt need for this invention yet nobody came up with it. This is Leo Pharmaceuticals, Your Honor. This is a case where the most recent prior art is 10 years old. The other asserted prior art is 60 years old. That weighs very heavily against a finding of obviousness. You're deep into your rebuttal. I am indeed, Your Honor. I wanted to make sure I addressed the question.  Okay. Mr. Stockwell. May it please the Court. Just taking the last issue on motivation to combine, I think Nike's fundamental argument is that the motivation to combine was lacking because of the way they view the references. This issue they raised in their reply brief that Nishida is fundamentally an additive process because you have the web supporting this. Why isn't this like Leo Pharmaceuticals? Well, because, Your Honor, first of all... Old, stale references that were attempted to being combined and this court rejected that combination. Sure, Your Honor. First off, just on the motivation to combine, Nike's argument doesn't address the actual rationale the board used to combine for which there's substantial evidence. We can come back to that. With respect to the Leo Pharmaceuticals issue and the secondary considerations issue, what I'd like to point out is that page 41 of our reply brief, of our response brief, what we said was, yes, there was a long felt need to reduce waste when you're making shoes. I mean, everybody knows there's always been that need. The very next sentence says, Nishida solved that need. And so did Schuster. As Your Honor posited to Nike's counsel, the art knew that you could put these structures next to each other on a web, use a web instead of a thickened material, that would do some savings. The art also knew from Schuster that you could knit to shape. So the art already solved the need. Now, what Nike also admits is that our expert, Dr. Frederick, explained that the reason, I mean, what Nike's fundamental long felt need was, well, that somebody didn't take the Schuster reference, dealing with the helmet swatch, textile manufacturing, and move it into making shoes. And our expert explained that by saying, wait a minute, when you're doing that, there are tradeoffs because of the complexity of the manufacturing process associated with shoes. So it's not, yes, you could, a skilled person could easily adopt the Schuster technique to the Nishida technique. And in fact, there was plenty of motivation to do that. But they'd have to consider some other process steps and costs. And thus rebutted their showing of secondary consideration. Which the board never made a finding of. Well, Your Honor, on that point, what I would point out is. What if we conclude that the board made no findings on secondary considerations, Evan? And I think the. What do we do? There's two answers to that. The first answer is what permeates their reply is that, well, you must remand, according to Nike, because of the Chinnery Doctrine. And what I would say is this court has addressed the Chinnery Doctrine in both N. Ray Kaminsky as well as, sorry? N. Ray Kaminsky. Yes. Do you need the citation? No. I know about it. What about cases like Rambis v. Ray and N. Ray Hung Tao, where we said specifically that the board failed to consider secondary considerations, so we must remand? How do you square up your argument? Well, Your Honor, what I would say is you've also said specifically that even under the Chinnery Doctrine, you still have to take into account harmless error. Okay? And what we contend is that when you look at what the board did, in this instance, if you read the board's decision, you can see that they did, in fact, implicitly consider the secondary consideration a long-felt need, and they concluded there was no long-felt need. And let me just refer you to a couple places in the record where you can see that. So at A38, the board noted Nishida's teaching regarding the reduction of waste by placing layouts in adjoining positions. So remember, the long-felt need here is to reduce waste. And the board says, wait a minute, Nishida, which is the prior art, does that. And the PTAB also found it, and Nike's response to that was, well, Nishida doesn't completely reduce waste. That was what their experts said at A1647-48. But the board also found that patent owner does not dispute that all the limitations of the claims are taught in the prior art. That is, you knew that you could do knit-to-shape from the Schussler references, and that the other limitations were taught in the Nishida reference. So the PTAB's finding, and this is at A38, Schussler teaches that the 2D helmet swatch of Figure 1 of Schussler may be knit-to-shape on a flat knitting machine. When you combine that with Nishida's discussion of reducing weight, the board is saying there is no long-felt need here. The art teaches that. Isn't the board supposed to look at whether the references create a prima facie case and then determine, look at secondary consideration? Isn't there a process under Graham v. Deere that the board was supposed to undertake, including an express consideration of secondary consideration? Well, I certainly agree that the board must consider secondary considerations when offered. I mean, that's clear in this court's controlling case law. The board did consider that. That was fully in the record. I don't believe that under this court's case law, the board necessarily has to discuss those when there's other findings that the board makes that indicate it considered it and decided there was no long-felt need. And here, I would urge that any error is harmless in light of those findings by the board. There simply was no long-felt need here sufficient to justify or ban. I think we have your argument on secondary consideration evidence. I think I asked about Leo Pharmaceutical. Do you have a response to that? No, Your Honor. I don't beyond what I mentioned on secondary consideration. Okay. Now, what about Claim 49? So, Claim 49, I think Your Honor is correct that what Nike overlooks is that what the board actually did was to say, okay, you're trying to sub in for Claim 19 two claims, Claim 48 and Claim 49. We're going to decide whether or not you've met your burden to show those claims are independently, patently distinct. They're not obvious over one another in light of the prior art. The analysis the board goes through where they talk about Nishida and the claims is to decide whether or not they're justified in offering two for one. And at the end of the analysis, the board says, no, we don't think you've shown that Claim 48 is patently distinct from Claim 49 or vice versa. You think that's a one-way or two-way analysis? I don't know. I don't know. I'll ask the PTO that. Go. Yeah. I mean, I don't know whether the – I will say, I don't remember what Idle Free says, but from the way they discussed it in the brief, it sounded like it was a two-way analysis because they looked at both limitations. They looked at what the other art, like Nishida, was teaching on that. Do you think that happened here?        They said, no. They said, no. They said, no. They said, no. They said, no. They said, no. They certainly – yes, from the way they discussed both of the claim elements and talked about how the claim elements were present, both in the admitted claims that were canceled – sorry, the claims that were canceled and, therefore, were deemed to be in the prior art, Nishida and the elements of Claims 48 and 49. So, if you assume for the moment that I've read Nishida and I don't see Nishida talking about knitting an aperture, let alone knitting an aperture that's based on omitting stitches in a position for where you would put the laces through, tell me where I'm misreading Nishida. Okay. So, when you look at Figure 2 of Nishida – and they point this out in their reply brief, Figure 2 and Figure 3. There's no lace holes in there. In Figure 2, there are no lace holes at the top where you would sort of normally expect laces. Okay. And what we pointed out to the PTO was, but when you look at the toe area, there's a net-like structure. And Nishida talks about being able to use that. And that net-like structure – I mean, you make a net-like structure, it creates apertures because of the holes between the interstices of the web. That creates the apertures. And we pointed out that the skilled person would look at that disclosure from Nishida and realize that, well, you can also put the net-like structure in the lacing areas. And that the strip that they point to in Figure 2 was added. Okay. And when the board – Nike criticized the board for referring to the permeability language in Nike specification. What the board was doing there was comparing the character of the disclosure that Nike cited in support of Claim 49, which had to do with that dropping some stitches for permeability, to suggest, well, you can do that in the lacing area for holes. And if you compare the character of that disclosure, which Nike said was written description support for Claim 49, with the character of the disclosure in Nishida, where you can also drop stitches, create the net-like structure in the toe, and a skilled person would look at that and say, you can put it in the lacing area. Well, Nishida didn't say that. Nishida didn't say you can drop stitches to create holes for permeability. Well – It talks about, I don't know, loose weaving in order to permit breathability, perhaps, but – That's – but that's sort of exactly my point. Nike's disclosure talks about loose weaving for permeability. They point to that to support a claim to drop stitching. And Nishida does the same thing. So, that's why we understood the board to be pointing to that disclosure in Nike, and the corresponding disclosure in Nishida. The other point here is that at no point does Nike say it was any kind of abuse of discretion for the board to say, we're going to treat these claims – Where in Nike's patent does it talk about you create apertures by loose weaving? I mean, I see Nike's patent talking twice about apertures. And each time, those apertures are formed by omitting stitches at specific locations. But that's – Nike's patent also talks about creating permeability, which is what I was saying. The board was pointing to that, and also pointing to the corresponding disclosure in Nishida. Both of those permeability disclosures, the skilled person would understand, are going to create apertures that can hold the lacing. And that's why the board was pointing to that part of Nike's disclosure, which was also similarly in the Nishida disclosure. If I could, going back to just the final issue that they raised with respect to the motion to amend, when I read their submission with respect to master image, if you look at the end of master image, I mean, it cites the Microsoft case that the court recently disclosed. You know, the thrust of Nike's opening brief on the motion to amend issue and their reply brief was really a challenge on the burden of proof, that the burden of proof should not have been placed on Nike and should have instead been placed on Adidas. I think the Microsoft case has squarely resolved that issue. And I had understood that from the Microsoft case. Footnote four in the Microsoft case, certainly reserved for future decisions, the issue of the idle-free decision that said, you have to also look at the prior art known to the patent owner not made of record. And I recognize that the PTO has changed that. The only thing I would point to, your honors, is that if you read the PTAB decision on this point, when you look at the PTAB decision, there are a number of indicators that suggest that the PTAB was understanding Nike to say to the board, hey, we know of some prior art, but these claims are different from that prior art. And the board was wanting to know, what is this other prior art that you know? And specifically, at A34, Nike's statement was that the proposed claims were patentable over the prior art, including, in ellipsis, other prior art known to Nike. At A35, the PTAB says, they talk about how Nike had failed to identify the other prior art. And that statement is made in the context, if you look at A4 in the PTAB's decision, Nike had disclosed to the patent office that there were a number of related proceedings involving other patents related to this one and pending applications. So the board is looking at Nike's disclosure and thinking, well, you guys know about some other prior art. You haven't made it of record. We need you to make this of record. So the error that would exist under Nike's posture here, if you accept the proposition that Microsoft has resolved the burden of proof issue, is that Nike has not had an opportunity to disclose to the board that other prior art. And you would be remanding for that. We come full circle back to the Chenery Doctrine, which says, harmless error applies. If, in fact, this panel sustains the board's decision on the fundamental question of obviousness, there's no reason to remand back to allow Nike to make that type of disclosure under the master image decision. So for those reasons, we would respectfully ask the court to affirm. But if, hypothetically, we felt like we needed to remand on 103, because at the very least there was a problem with not making any findings on secondary considerations, then maybe we also need to remand on the master image issue. Well, I certainly recognize that if the court were to remand on the secondary considerations issue, that would allow Nike the opportunity to readdress the motion to amend issue under the new master image standard, right? I mean, they could make the disclosure that the board, I mean, if you read the board decision, it seems like the board is thinking, well, you guys know some prior art. You need to disclose it. And they hadn't, at that point, they hadn't made any of those disclosures. And I certainly agree that that would be part of the process. I mean, at that point, they could make the disclosure that master image says they should. Thank you. Okay, thanks. Okay, here from the PTO, Mr. Foreman. Do you want to start with master image 3D? Sure. I've read that order as well as the Federal Register notice. To me, it's saying that the PTO is telling all of us that master image 3D serves as essentially a translation document as to what is the real meaning of the idle free order. And so, it's not the PTO stepping away and renouncing idle free. It's interpreting idle free. Is that a fair assessment of what is happening in master image 3D? Yes, I would agree with that. I think that it's not a change of idle free. It's more of a clarification of idle free. You know, the board denied, here, denied Nike's motion to amend under what was at the time a fair reading of idle free. But now, master image has explained that the reference to prior art not in the record known to the patent owner is limited to, excuse me, the prior art that would be disclosed by the patent owner under the duty of candor. So, I think we would acknowledge that given this clarification, the board here maybe read idle free too aggressively in this decision. And, you know, there does seem to be a conflict. We would acknowledge there would be a conflict between this board decision and what was said in master image. Because we're not making any allegations against Nike that they violated their duty of candor. Now, with the added clarification of master image, it becomes clear that the patent owner has no really affirmative duty to perform a search or, you know, submit prior art beyond what is required by the duty of candor. Okay. So, as I understood it, there were two independent grounds for denying the motion to amend. Correct. One was idle free, and the other one was on the merit these amended claims would still be optional. Correct. If we were to conclude that there was a defect in the 103 analysis of the amended claims, because there was a failure to consider the secondary consideration evidence, then not only would we have to vacate that ground for denying the motion to amend, but would we vacate or would you be fine if we reversed the other ground for denying the motion to amend, given what you just told us about your understanding of master image 3D? I believe that if the case, if the obviousness finding is vacated and the case is being sent back to the board, I think vacating and remanding on the master image issue is appropriate and letting the board reapply or apply the master image decision to Nike's motion. I think that would be the most appropriate result. Do you think there's a defect on a failure to consider the secondary consideration evidence? No, I would agree that there's no explicit analysis in the board's opinion of secondary considerations. I don't think anyone would dispute that. I think that like Adidas talked about and like we talked about in our brief, I think that if you look at what the board said and you look at what Nike said, going back to Nike's motion, Nike now obviously is making a very big deal about their secondary considerations argument given the board's decision, but if you look at Nike's original motion to amend, they devote a single paragraph to this at the end and the only evidence they cite is their expert's declaration and their experts really just point to Nishida saying, well Nishida tries to reduce waste but doesn't reduce all of the waste, so therefore there's this long felt need. I mean I think that given the way, this case really was never about secondary considerations, and so I think that with that backdrop it's kind of understandable that the board didn't really focus on secondary considerations, but I think that given what the board said about both saying that Nishida addressed the issue of reducing waste and making these the shoe uppers, and given the fact that Schuessler references disclose eliminating all the extra waste and forming the Nick hats, I think it can be understood that the board considered the secondary considerations argument and did not accept it. Can we go to Proxicon? Sure. Mr. Fleming was saying that this panel has an open lane considering whether the statute commands that the burden of proof for the patentability, unpatentability of these claims still remains with you and the petitioner, but not with the patent owner when it comes to proposed amended claims. Is that your reading of Proxicon? No, I think Proxicon resolved the issue of burden of proof. Did Proxicon do a textual treatment of the statute? Yeah, and I think what Proxicon said was that the board's interpretation of 37 CFR 42.20C, which says that anyone filing a motion should bear the burden of proof in establishing the relief sought, demonstrates that a patentee filing a motion to amend bears the burden of proof showing that the claims are patentable. I think that the court in Microsoft accepted that and agreed, so I think that this issue was resolved. When it comes to this patentable distinction between two proposed claims, is that a one-way or a two-way analysis? I'm not sure. I'm not sure what you mean by one-way and two-way. Okay. Obviousness type double patenting, I'm just assuming that that is the mode of analysis that would apply when it comes to judging two proposed claims that are replacing one single canceled claim and then to comply with your regulation on patentable distinctness. There's this case law. It might be confusing, but sometimes we use a one-way analysis and other times we use two-way analysis. I was just trying to understand if the agency has a position. Honestly, in this case, we don't have a position on this. It wasn't addressed in the board decision, really. It wasn't addressed in our briefing. Okay. I wanted to ask you a question going back to Master Image. If Nike has satisfied its duty of candor, then is the statement that it has in its motion to amend, does that satisfy Master Image? I think it would. I agree with the DSS console that Nike's motion is a little ambiguous because it seems like there may be some art out there that it knows about, but it's not disclosing it. I wouldn't go so far as to say that Nike is violating its duty of candor. I think it's implied that everyone who practices before the office has a duty of candor. I don't necessarily know that you need an affirmative statement saying, yes, I comply with my duty of candor. But given Nike's statement, it may be that they know of something that they didn't disclose, but I'm not going so far as to saying that that's what happened. I'm sorry. I just remembered another question. Sure. TEVA, Standard Review of Claim Construction? Yes. Do you agree that there are times where the patent board is relying on extrinsic evidence, and then when it does, then therefore when we are reviewing the patent board's claim construction, we're supposed to somehow divine which components of that claim construction rested on extrinsic evidence, and to the extent it does, then we're supposed to give some extra deference beyond the broadest reasonable construction analysis that we do? I believe that this court has applied the TEVA standard to appeals from board cases, so I would think that if the board is relying on extrinsic evidence, then it's entitled to the extra deference just like from a district court case. How that squares with the broadest reasonable interpretation, to be honest, I'm not sure. I think it's tough because they're really two different standards. The broadest reasonable interpretation is how the board reads the claims before them, and how the examiner reads the claims before him. The TEVA standard is going towards how much deference you give the board interpretation, so they're really two different things, I think. But I agree that this court has applied TEVA to review of board decisions. Mr. Fleming, we will certainly restore all of your rebuttal time. Very kind, Your Honor. Thank you very much. I will try not to use all of it, or at least no more of it than the circumstances would require. To start with ProxyCon, on page 24 of the split opinion, this court says, ProxyCon does not argue that the PTO acted outside its statutory authority in promulgating either one, namely either of the regulations that were being asserted by ProxyCon in that case. So there is no statutory decision, no parsing of statutory language in ProxyCon. It simply wasn't raised. It's open to this court to consider that in this case, and we think it should, and I didn't hear any argument on the other side that Section 316E can be interpreted in any way other than the way we're advancing. Just to back up, I think if this court were to affirm a decision like this, it would send a somewhat remarkable message to the board. It would suggest that the board can completely ignore properly presented evidence of secondary considerations. And it would say that no matter what errors it makes, they can always be backfilled by counsel for the petitioner or counsel for the government on appeal in front of this court. That is not the system that Congress created. It's not consistent with the patent law or with administrative law, and this court shouldn't countenance it in this case. Just in terms of brief response to some of what you heard, a lot of Mr. Stockwell's arguments about what Nishida does or doesn't disclose, whether there was or was not a long-felt need, whether it was or was not solved by Schuessler, these are issues on which the board has not made a finding, and it would not be appropriate for this court under Chenery, and Comiskey doesn't change this. When there is fact-finding that is needed by the board, it is not for this court to substitute its own judgment. Rather, it's to remand to the board and allow them to exercise their congressional mandate to make the factual findings that are needed. And on the point of Teva, all of the alternative arguments that Adidas is trying to put in front of this court require some kind of fact-finding or require the overturning of fact-finding that the board has already made on the issues that it resolved in Nike's favor. For instance, with respect to the claim construction and the anticipation points, the idea that there is a structural difference between omitting stitches or flat-knit edges and punching out holes or cutting the edges so that the yarns get frayed. That is a finding the board makes on A21, I believe. And in order for this court to reverse that, that would be a violation of the Chenery Doctrine we would submit. I have one question for you. Yes, Judge Stoltenberg. Beyond the long-felt need, was there other secondary consideration, evidence that was presented to the board? That is the one we relied on, Your Honor. I mean, there is some evidence of industry praise about how flat-knit is a revolutionary product in the field, but we don't rely on that as a secondary consideration. Long-felt need is the most important one, and there was no answer to the Leo Pharmaceutical point, Judge Chen, that you raised quite pointedly. There is a significant age gap in the references in this case, and the idea that you could simply combine these references without any evidence and without any explanation, at least, as to why this reference sat around for 60 years and nobody thought of doing it this way until Nike did it this way is certainly something the board, at the very least, needs to consider. The admission that an ideological free was read too aggressively in this case is welcome, we certainly agree. That's not an alternative basis for affirmance anymore, and I also think Your Honor is quite right that Figure 2 of Nishida simply does not show lacels. It could have, but it doesn't. So we would submit that, as for all the claims, the judgment should be reversed or, at the very least, vacated and remanded to the board for further proceedings, and I thank the Court for its attention. Thank you.